UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REGENERON PHARMACEUTICALS, INC.,

Plaintiff,

-against-

SANOFI BIOTECHNOLOGY SAS, et al.,

Defendants.

**OPINION & ORDER**

24-CV-08751 (PMH)

Philip M. Halpern, United States District Judge:

Regeneron Pharmaceuticals, Inc. ("Regeneron" or "Plaintiff") presses a claim for breach of contract against Sanofi Biotechnology SAS, Sanofi, S.A., sanofi-aventis U.S. LLC, and Genzyme Corporation (collectively, "Sanofi" or "Defendants"). (Doc. 31, "Am. Compl.").[1] Defendants move to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 49; Docs. 50 & 51, "Def. Br."). Plaintiff filed an opposition (Docs. 53 & 54, "Pl. Br."), and the motion was fully briefed with the filing of Defendants' reply (Docs. 55 & 56, "Reply").[2]

For the reasons stated below, Defendants' motion to dismiss is DENIED.

---

[1] Citations to specific pages of the Complaint and other filings on the docket correspond to the pagination generated by ECF.

[2] The parties, in accordance with the Court's Individual Practices, filed unredacted versions of their briefs under seal (Docs. 50, 53, 55) and redacted versions available for public viewing. (Docs. 51, 54, 56). Defendants also filed the contract at issue entirely under seal. (Doc. 50-1). Both Defendants' and Plaintiff's unopposed letter-motions to seal their respective briefs and the contract at issue (Docs. 48, 52) are granted. Because the parties' briefs and the contract at issue are filed under seal, the Court's Opinion and Order will be filed under seal and a redacted version will be filed publicly.

1

## BACKGROUND

The Court, for purposes of deciding the pending motion, accepts as true the well-pled factual allegations in the Amended Complaint and draws all reasonable inferences in Plaintiff's favor. *See Lesser v. TD Bank, N.A.*, 463 F. Supp. 3d 438, 445 (S.D.N.Y. 2020).

Plaintiff, in the Amended Complaint, alleges one claim for relief that Defendants breached the Amended and Restated Collaboration Agreement (Doc. 50-1, "LCA")[3] entered into between Plaintiff, Aventis Pharmaceuticals Inc., and Sanofi-Aventis Amerique du Nord on November 10, 2009 by refusing to provide Plaintiff and its third-party auditors access to Defendants' agreements with pharmacy benefits managers ("PBM Agreements"). (Am. Compl. ¶¶ 27, 74). Plaintiff seeks a variety of legal and equitable relief including money damages, specific performance, an injunction, and a declaratory judgment. (*Id.* at VI). Plaintiff, Aventis Pharmaceuticals Inc., and Sanofi-Aventis Amerique du Nord entered into a License and Collaboration Agreement on November 28, 2007, the scope of which was expanded in the LCA. (Am. Compl. ¶¶ 26-27). The LCA has since been amended five times and remains in effect. (*Id.* ¶¶ 1 n.1, 27). Defendants Sanofi Biotechnology SAS and Sanofi S.A. are the successors-in-interest to Aventis Pharmaceuticals Inc. and Sanofi-Aventis Amerique du Nord, respectively. (*Id.* ¶¶ 11-12). Defendants sanofi-aventis U.S. LLC and Genzyme Corporation are both subsidiaries of Defendant Sanofi S.A. and allegedly perform certain obligations for Defendants Sanofi Biotechnology SAS and Sanofi S.A. under the LCA. (*Id.* ¶¶ 12-15). Defendant Sanofi Biotechnology SAS is also a subsidiary of Defendant Sanofi S.A. (*(Id.* ¶¶ 12, 15).

---

[3] Defendants argue, and Plaintiff does not dispute, that the Court can and should consider the LCA in deciding the pending motion. (Def. Br. at 5 n.2; *see also* Pl. Br.). The Court considers the LCA, in addition to the Amended Complaint, in deciding Defendants' motion to dismiss because the LCA is integral to the Amended Complaint and incorporated by reference. *See Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. 2014).

The parties to the LCA agreed to "cooperate in good faith to Develop, Manufacture and Commercialize Licensed Products . . . to optimize the commercial potential of each Licensed Product." (*Id.* ¶ 30; LCA § 2.1).[4] The LCA makes Sanofi "the lead Party with respect to the Commercialization of Licensed Products in the Field." (LCA § 6.1). One such product that the parties agreed to develop and commercialize under the terms of the LCA is Dupixent, "an injectable biologic" used to treat a host of conditions, including atopic dermatitis. (Am. Compl. ¶ 28). Dupixent has been a widely successful pharmaceutical, reaching $8.8 billion in sales in 2023 and, as of August 2024, approximately one million users worldwide. (*Id.* ¶ 29).

Sanofi, as part of its commercialization efforts, enters into PBM Agreements "to establish pricing terms, coverage, formulary positioning, access, and other terms for Dupixent." (*Id.*). Pharmacy benefit managers "serve as intermediaries between manufacturers, pharmacies, and insurance companies to negotiate rebates and discounts on coverage terms and formulary placement, among other things." (*Id.* ¶ 39). Plaintiff alleges that "the discounts and rebates provided under the PBM Agreements for Dupixent are estimated to be a significant fraction of total Dupixent sales in recent years." (*Id.* ¶ 43). According to Plaintiff, "[t]he PBM Agreements may reveal additional reimbursements and profit-sharing adjustments in Regeneron's favor" and, thus, access to the PBM Agreements is necessary "to verify Defendants' and their Affiliates' compliance with other material provisions of the LCA." (*Id.* ¶¶ 50, 52).

---

[4] Plaintiff, Aventis Pharmaceuticals Inc., and Sanofi-Aventis Amerique du Nord, also entered into the Amended and Restated Discovery and Preclinical Development Agreement, under which Plaintiff was tasked with developing products and offering them to Sanofi to jointly develop and commercialize. (Am. Compl. ¶¶ 26-27). If Sanofi exercised its right to co-develop and commercialize a product with Plaintiff, the product became a "Licensed Product" under the LCA and would be governed by the LCA's terms. (*Id.*). The Amended and Restated Discovery and Preclinical Development Agreement is no longer in effect. (*Id.* ¶ 27).

Plaintiff alleges that it and its auditors must review Defendants' PBM Agreements to ensure Defendants are not "bundling" Dupixent with other pharmaceuticals, which is prohibited under the LCA. (*Id.* ¶ 53).[5] Plaintiff also alleges that it is entitled to access "[c]ommunications between Defendants and PBMs . . . whether oral or in writing" to determine if Defendants are bundling Dupixent with other products. (Am. Compl. ¶ 53 n.6). Plaintiff contends that LCA Section 6.4(b) grants it "full access to material information directly relating to the Commercialization of [Dupixent]," and that this "material information" includes the PBM Agreements and "[a]ny side agreements between Defendants and the PBMs . . . ." (*Id.* ¶¶ 66, 74 (first alteration in original)). The LCA, according to Plaintiff, also grants its auditors access to the PBM Agreements through Sections 14.1 and 14.2(a), which allow each party to the agreement to hire third-party auditors to verify the "accuracy of all financial, accounting and numerical information and calculations provided, and payments made, under th[e LCA]." (*Id.* ¶¶ 74-75 (alteration in original)). Defendants offered Regeneron's auditors, but not Regeneron, access to "discrete portions of the PBM Agreements" selected by Defendants, accessible only through "screen-sharing technology controlled by Defendants' representatives," and provided that the auditors "refrain from capturing any image of the screen-shared Agreements." (*Id.* ¶ 45). Plaintiff contends that it and its auditors are entitled to full access to the PBM Agreements. (*Id.* ¶¶ 41, 46).

## STANDARD OF REVIEW

A Rule 12(b)(6) motion enables a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a

---

[5] "Bundling," under the LCA, refers to the inclusion of "any Licensed Product as part of any multiple product offering or discount . . . ." (LCA § 6.11). The LCA also prohibits Defendants from pricing "the Licensed Products in a manner that (a) is reasonably likely to disadvantage a Licensed Product in order to benefit sales or prices of other products offered for sale by a Party or its Affiliates to such customer, (b) is inconsistent with the Collaboration Purpose or (c) would result in pricing and discounting inconsistent with the applicable Market Guidelines." (*Id.*).

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). The factual allegations pled "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.

"When there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Thus, the Court must "take all well-ple[d] factual allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff[]." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). The presumption of truth, however, "'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alteration in original) (quoting *Iqbal*, 556 U.S. at 678). Therefore, a plaintiff must provide "more than labels and conclusions" to show entitlement to relief. *Twombly*, 550 U.S. at 555.

For a plaintiff to sustain a plausible claim for breach of contract, the plaintiff must allege: "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).

## ANALYSIS

Defendants advance two arguments in support of their motion to dismiss: (1) the LCA's dispute resolution provisions prohibit Plaintiff from bringing this lawsuit; and (2) the terms of the

LCA do not require Defendants to furnish their PBM Agreements to Plaintiff nor its auditors and therefore no breach of contract claim may survive. (Def. Br. at 6). However, under the plain text of the LCA, Plaintiff's claim constitutes a "Legal Dispute" and is thus properly before the Court. (*See* LCA §§ 1.67, 10.3). Further, at the pleading stage, accepting as true Plaintiff's well-pled factual allegations and giving Plaintiff every reasonable inference, Plaintiff has plausibly pled that Defendants have breached the LCA.

I.      Dispute Resolution Procedures

The LCA contains procedures which dictate how the parties are to resolve disputes concerning its performance. (*See* LCA Art. X). Defendants argue that Plaintiff cannot bring its claim in Court because Plaintiff's allegations constitute a "Governance Dispute" under the LCA and Governance Disputes ██████████████████████ (Def. Br. at 15-16). Plaintiff contends that its claim is a "Legal Dispute" under the LCA and, thus, properly before the Court. (Pl. Br. at 13). The parties agree that ████████████████████████████████████████████████ ████████████████████ (*See id.*; Def. Br. at 17-18).

"It is axiomatic under New York law . . . that '[t]he fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties.'" *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (alteration in original) (quoting *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997)). To honor the parties' intentions, "[t]he words and phrases used by the parties must . . . be given their plain meaning." *Cervecería Modelo de México, S. de R.L. de C.V v. CB Brand Strategies, LLC*, No. 23-810-CV, 2024 WL 1253593, at *2 (2d Cir. Mar. 25, 2024) (quoting *Brooke Grp. Ltd. v. JCH Syndicate 488*, 663 N.E.2d 635, 640 (N.Y. 1996)). New York courts endeavor "to interfere as little as possible with the freedom of consenting parties" to consent to alternative dispute resolution mechanisms. *Westinghouse Elec.*

*Corp. v. N.Y.C. Transit Auth.*, 623 N.E.2d 531, 534 (N.Y. 1993) (quoting *Siegel v. Lewis*, 358 N.E.2d 484, 485 (N.Y. 1976)). However, "New York courts have generally required explicit and clear expressions of intent to submit to alternative dispute resolution before giving full effect to such clauses," especially "when a dispute resolution clause purports to vest the authority to settle all questions pertaining to a contract with a representative of one of the contracting parties." *Dart. Mech. Corp. v. XL Specialty Ins.*, 593 F. Supp. 2d 464, 468 (E.D.N.Y. 2008) (citing *Crimmins Contracting Co., Inc. v. City of New York*, 542 N.E.2d 1097, 1099 (N.Y. 1989)).

Pursuant to the LCA, "Governance Disputes" ███████████████ whereas "Legal Disputes" may be brought in court. (*See* LCA Art. X). The LCA defines "Governance Disputes" as "[d]isputes, controversies and claims related to matters intended to be decided within the governance provisions of this Agreement set forth in Article III" and provides that such disputes "shall be resolved pursuant to Article III . . . *except to the extent any such dispute, controversy or claim constitutes a Legal Dispute, in which event the provisions of Section 10.3 shall apply.*" (*Id.* § 10.2 (emphasis added)). The LCA defines a "Legal Dispute" as "any dispute related to a Party's alleged failure to comply with this Agreement or the validity, breach, termination or interpretation of this Agreement." (*Id.* § 1.67). Section 10.3 further explains that for Legal Disputes, after following certain procedures, "the Parties shall be free to pursue any rights and remedies available to them at law, in equity or otherwise . . . ." (*Id.* § 10.3).

From the plain words of the LCA, Plaintiff's claim is a Legal Dispute. Plaintiff alleges that Defendants breached Sections 6.4(b), 14.1, and 14.2(a) of the LCA by refusing to furnish their PBM Agreements to Plaintiff and its auditors. (*See* Am. Compl. ¶¶ 67-76). Plaintiff's claim also raises questions regarding the interpretation of those very same sections of the LCA. Thus, Plaintiff's claim is a "Legal Dispute" as defined in the LCA and is properly before the Court. The

parties did not explicitly and clearly assent to resolve this dispute under the LCA's ███████

█████████████████ *Dart. Mech. Corp.*, 593 F. Supp. 2d at 468 (citing *Crimmins Contracting*

*Co.*, 542 N.E.2d at 1099). To the contrary, the parties unequivocally agreed that such disputes

could be brought in court. (*See* LCA § 10.3). Whether or not Plaintiff's claim could also constitute

a Governance Dispute is immaterial, as Legal Disputes are expressly exempted from the dispute

resolution procedures for Governance Disputes. (*Id.* § 10.2).

Defendants advance several arguments in support of their position that the LCA's

procedures for resolving Governance Disputes control. Defendants cite *Kalisch-Jarcho, Inc. v.*

*New York*, 533 N.E.2d 258, 260 (N.Y. 1988) for the proposition that, because the LCA contains a

"different, reasonable means for resolving such disputes," *i.e.*, the procedures set forth in Article

III of the LCA, those procedures must control. (Def. Br. at 16). *Kalisch-Jarcho* is inapposite

because, unlike Plaintiff, the plaintiff in *Kalisch-Jarcho* did not contest that the dispute resolution

procedures in the contract at issue applied, but instead argued that the dispute resolution procedures

violated public policy. 533 N.E.2d at 261. Here, Plaintiff is not "circumvent[ing] [its] contractual

undertakings" by arguing that its claim may be brought in court, *id.*, but instead seeks to exercise

its bargained-for right. Defendants agreed that such disputes could be brought in court, they cannot

now complain that such a dispute is in fact being brought in Court. *Cf. Bird v. Shearson*

*Lehman/American Express*, 926 F.2d 116, 121 (2d Cir. 1991) ("[Plaintiff] signed the agreement

that contained the arbitration clause. He cannot complain that his rights were bargained away by a

third party.").

So too, Defendants' argument that compliance with Sections 6.4(b), 14.1, and 14.2(a)

involves a █████████████ of the LCA's █████████████ fails. (Def. Br. at

17-18). Nothing in the LCA suggests that Section 6.4(b)'s requirement that "Sanofi provide

Regeneron with full access to material information directly relating to . . . sales" or the scope of Article XIV's audit provisions are ████████████████████████████ ████████████████████████ To the contrary, Section 6.4(b) states that Sanofi *will* provide Regeneron with such information, and Sections 14.1 and 14.2(a) state that the parties *shall* allow auditors to inspect their books and records. *See Hewitt v. Helms*, 459 U.S. 460, 471 (1983) (noting that "shall," "will," and "must" is "language of an unmistakably mandatory character").

Nor does the Court's interpretation of the LCA render the ████████████████████ "superfluous or meaningless." (Def. Br. at 18 (quoting *SA Luxury Expeditions, LLC v. Schleien*, No. 22-CV-03825, 2023 WL 8072914, at *1 (S.D.N.Y. 2023); *see also* Reply at 8 ("The Court should not read out the governance process but instead enforce it.")). The only question the Court need decide is whether the instant dispute is properly before the Court. However, recognizing that interpretations of contracts that have "the effect of rendering at least one clause superfluous or meaningless" are disfavored, *SA Luxury Expeditions*, 2023 WL 8072914, at *1, the Court notes that numerous disputes would not constitute Legal Disputes and would thus fall within the LCA's ██████████████████████████[6] If, however, as is the case here, a party alleges that another party breached its obligations under the LCA, the LCA defines such a dispute as a Legal Dispute that may be brought in court. (*See* LCA §§ 1.67, 10.3).

Accordingly, Plaintiff's breach of contract claim is properly before the Court.

---

[6] For example, the LCA tasks the Joint Commercialization Committee with "developing and proposing to the JSC the global strategy for the Commercialization of each Licensed Product in the Field in the Territory." (LCA § 3.4(b)(i)). A disagreement over the "global strategy" for Commercialization would clearly fall within the ambit of the LCA's ████████████████████ The LCA also delegates to the Joint Finance Committee the task of determining the "form, format and level of detail" of all reports under Section 9.5. (*Id.* § 9.5). A dispute concerning the "form, format and level of detail" of such reports would fall within the purview of the Joint Finance Committee and ████████████████ ████████████████████ (*See id.* Art. III).

9

II.    Breach of Contract

Plaintiff, in the Amended Complaint, alleges a breach of three sections of the LCA—Sections 6.4(b), 14.1, and 14.2(a). (Am. Compl. ¶¶ 74-75). As previously mentioned, "[u]nder New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell,*, 632 F.3d at 799. "On a motion to dismiss a breach of contract claim, 'we should resolve any contractual ambiguities in favor of the plaintiff.'" *Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 86 (2d Cir. 2015) (quoting *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)). Defendants are correct that the central question is not whether they are required to share information under the LCA "but rather what information qualifies." (Reply at 6-7). But the Court finds, at the motion to dismiss stage, that Plaintiff has plausibly pled that the PBM Agreements qualify as information that Sanofi is required to share under the LCA.

A. Section 6.4(b) of the LCA

Plaintiff alleges in the Amended Complaint that Section 6.4(b) of the LCA entitles it to access "[a]ll material information related to the Commercialization of Dupixent," including Defendants' PBM Agreements and "any written or oral side agreements or understandings . . . ." (Am. Compl. ¶¶ 33, 57-58). Section 6.4(b) provides that "Sanofi will provide Regeneron with full access to material information directly relating to the Commercialization of each Licensed Product in the Field, including, without limitation, information relating to anticipated launch dates, key market metrics, market research, and sales." (LCA § 6.4(b)). "Commercialization" is defined, in part, as "with respect to a Licensed Product, any and all activities directed to marketing, promoting

. . . detailing, distributing, importing, offering for sale, having sold and/or selling such Licensed Product . . . ." (*Id.* § 1.20).

Plaintiff alleges that Defendants' PBM Agreements are "material information directly relating to . . . sales" of Dupixent because the PBM Agreements "contain complex terms related to coverage of, formulary positioning for, and access to Dupixent, as well as pricing, product offerings, services, and any rebates given by Defendants to the PBMs." (Am. Compl. ¶ 40). Defendants advance a more limited reading of Section 6.4(b), arguing, among other things, that the "material information" available to Plaintiff under Section 6.4(b) is limited to information necessary for Plaintiff to perform its role in Commercialization and posits that the overall structure of Article VI supports its reading. (Def. Br. at 21). However, as alleged in the Amended Complaint, the PBM Agreements are material information directly relating to the sale of Dupixent and, thus, Plaintiff has plausibly pled that Defendants breached the LCA by not providing Plaintiff with such agreements.

Defendants, citing *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 75 (S.D.N.Y. 1999), argue that the information-sharing requirement of Section 6.4(b) is "limited to the same class as its examples." (Def. Br. at 20; Reply at 10). *ESI, Inc.* states that the phrase "including, but not limited to" is not limited to the specific examples provided, "but should nevertheless be restricted to obligations of the same type or class." 61 F. Supp. 2d at 75. Here, the LCA provides that Plaintiff is entitled to "full access to material information directly relating to the Commercialization of each Licensed Product . . . including . . . information relating to . . . *sales*." (LCA § 6.4(b) (emphasis added)). Plaintiff, in the Amended Complaint, alleges that the PBM Agreements "establish pricing, rebates, and other important terms governing the *sale* of Dupixent." (Am. Compl. ¶ 2 (emphasis added); *see also, e.g.*, *id.* ¶ 29 ("Defendants enter into the PBM Agreements to establish pricing

terms, coverage, formulary positioning, access, and other terms for Dupixent."); *id.* ¶ 42 ("The PBM Agreements . . . contain information relating to Dupixent's sales."); *id.* ¶ 43 ("[T]he discounts and rebates provided under the PBM Agreements for Dupixent are estimated to be a significant fraction of total Dupixent sales in recent years.")). Thus, as alleged in the Amended Complaint, the PBM Agreements are "of the same type or class" of the enumerated examples of "material information" provided in Section 6.4(b).

Defendants also argue that Article VI "confirms that Sanofi must only share information to aid Regeneron's limited contribution to Dupixent's Commercialization." (Def. Br. at 21). The LCA, Defendants contend, should be read as a whole and, since Sanofi is the "lead Party" responsible for Dupixent's Commercialization, Plaintiff's "full access to material information relating to the Commercialization" of Dupixent should be limited to its role in such Commercialization. (*Id.*). Article VI contains no such limitation on Plaintiff's access to material information relating to the Commercialization of Dupixent. (*See* LCA Art. VI). Section 6.4(b) requires Sanofi to provide Regeneron with material information directly related to Commercialization, not material information only necessary for Regeneron to perform its role in Commercialization. (*See id.* § 6.4(b)). Indeed, Section 6.4(b) states that "*Sanofi* will provide *Regeneron*" with information relating to the Commercialization of Dupixent, acknowledging Sanofi's lead role in Commercialization and, accordingly, that information will flow from Sanofi to Regeneron, not the other way around. (*Id.* (emphasis added)).

Moreover, Defendants' argument that the PBM Agreements are not expressly mentioned in the LCA (Def. Br. at 19) is unpersuasive. "Defendants' argument elides the distinction between something that is not *expressly* mentioned in the [contract] and something that is not *encompassed*

by the agreement." *Joseph v. Gnutti Carlo S.p.A.*, No. 15-CV-08910, 2016 WL 4764924, at *6 (S.D.N.Y. Sept. 12, 2016).[7]

Defendants further argue, without citing to any authority, that ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ (Def. Br. at 22). Defendants' argument is misplaced. The Court is not going to limit Section 6.4(b)'s information-sharing requirement simply because it would have hypothetically been more appropriate to include it in another section of the LCA. The Court also notes that Section 6.4 is titled: "Commercialization Efforts; *Sharing of Commercial Information*," (LCA § 6.4 (emphasis added)); thus, the parties clearly intended for Section 6.4, not Section 6.6, to govern the sharing of commercial information, including "material information directly relating to . . . sales." (*Id.* § 6.4(b)).

Defendants also contend that Plaintiff's interpretation of Section 6.4(b) "would unravel the LCA's carefully designed 'Periodic Reports' framework" and "make the LCA's audit provisions incoherent." (Def. Br. at 22-23). Defendants point to no language in either Article IX or Article XIV which limit Section 6.4(b)'s information-sharing requirement. (*See id.*). Indeed, adopting Defendants' interpretation of the LCA would render Section 6.4(b) a nullity as Section 6.4(b)'s information-sharing requirement would be superfluous with the information in the periodic reports required by Article IX and the audits allowed through Article XIV. *See SA Luxury Expeditions*, 2023 WL 8072914, at *1 ("An interpretation that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." (citation modified)).

---

[7] Defendants argue that the lack of confidentiality provisions regarding the sharing of the PBM Agreements evinces a lack of intent on the part of the parties to share such agreements. (Def. Br. at 23; Reply at 9). But the LCA contains provisions governing the exchange of confidential information between the parties. (*See* LCA Art. XVI).

Contrariwise, Plaintiff's interpretation of the LCA does not render Articles IX and XIV meaningless, as Section 6.4(b)'s information-sharing requirement is separate and apart from the information-sharing requirements of those provisions. (Pl Br. at 29-30). Plaintiff's plausible interpretation of Section 6.4(b) also would not allow Plaintiff "broader access than its auditors," (Def. Br. at 23) because Section 14.2(b) provides that the auditors "shall not reveal to the Party seeking verification the details of its review, *except for such information as is required to be disclosed under this Agreement . . . .*" (LCA § 14.2(b) (emphasis added)). As plausibly alleged in the Amended Complaint, the PBM Agreements are "material information directly relating to" the sale of Dupixent, (Am. Compl. ¶ 42), and Plaintiff's auditors can therefore share such information with Plaintiff. (LCA § 14.2(b)).

Finally, the Court finds that Defendants' argument regarding "antitrust concerns" if Plaintiff were allowed access to Defendants' PBM Agreements pursuant to the LCA (Def. Br. at 24) to be without merit. *Todd v. Exxon Corp.*, 275 F.3d 191, 212 (2d Cir. 2001) involved a Sherman Act claim, and concerned allegations that the defendants were fixing salaries of employees within their industry. Here, there are no such allegations. Moreover, "[t]he interposition of antitrust defenses in contract actions is not favored." *X.L.O. Concrete Corp. v. Rivergate Corp.*, 634 N.E.2d 158, 161 (N.Y. 1994) (citing *Kelly v. Kosuga*, 358 U.S. 516, 518 (1959)). "Nevertheless, antitrust defenses will be upheld in cases where a court's judgment would result in enforcement of the 'precise conduct made unlawful by the Act.'" *Id.* (quoting *Kelly*, 358 U.S. at 518). Defendants argue that requiring them "to divulge PBM agreements to another drug company, especially since they reveal pricing for non-Dupixent products, would spark serious antitrust concerns." (Def. Br. at 24). Defendants do not explain how these "serious antitrust concerns" are unlawful under any antitrust laws. *X.L.O. Concrete Corp.*, 634 N.E.2d at 161-62.

Accordingly, Plaintiff has plausibly pled that Defendants breached Section 6.4(b) of the LCA.

B. Sections 14.1 and 14.2(a) of the LCA

Plaintiff also alleges that Defendants breached Sections 14.1 and 14.2(a) of the LCA by not allowing Plaintiff's auditors "to examine the complete PBM Agreements . . . ." (Am. Compl. ¶ 75). Defendants argue that Plaintiff's breach of contract claim as to Sections 14.1 and 14.2(a) fails because Article XIV does not allow auditors "full access" to Defendants' records, but instead limits their access to "verifying the accuracy of all financial, accounting and numerical information and calculations provided, and payments made, under this Agreement." (Def. Br. at 25 (quoting LCA § 14.2(b)).

Section 14.1 of the LCA requires each party to "permit auditors . . . to examine the books of record and account of such Party or such Affiliate to the extent relating to this Agreement . . . ." (LCA § 14.1). Section 14.2(a) provides that each party to the LCA has the right to have an independent accounting firm audit "the books and records of the other Party and its Affiliates to the extent relating to this Agreement . . . for the sole purpose of verifying the accuracy of all financial, accounting and numerical information and calculations provided, and payments made, under this Agreement . . . ." (*Id.* § 14.2(a)). Plaintiff alleges in the Amended Complaint that "[i]t is normal and customary practice for auditors to request and review third-party contracts, like the PBM Agreements, when evaluating rebates and other calculations related to commercializing pharmaceutical products." (Am. Compl. ¶ 37). Plaintiff further alleges that, without the PBM Agreements, its auditors cannot verify the accuracy of the "profit-sharing calculations between Defendants" and Plaintiff. (*Id.*). Thus, as alleged in the Amended Complaint, the PBM Agreements are necessary to verify "the accuracy of all financial, accounting and numerical information and

calculations provided, and payments made," under the LCA. (LCA § 14.2(a)). The single case cited by Defendants in support of their argument does not change this calculus. *See Federal Trade Comm'n v. Metro Commc'ns Corp.*, No. 94-CV-00142, 1995 WL 571461, at *3-4 (S.D.N.Y. Sept. 27, 1995) (interpreting contract according to its "plain language").

Accordingly, Plaintiff has plausibly pled that Defendants breached Sections 14.1 and 14.2(a) of the LCA.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED.

Defendants are directed to file an answer to the Amended Complaint within fourteen days of the date of this Order. A Notice of Initial Conference will be separately docketed. The Clerk of Court is respectfully directed to terminate the motion sequence pending at Doc. 49 and the letter-motions pending at Docs. 48 and 52.

**SO ORDERED.**

Dated:   White Plains, New York
        March 17, 2026

PHILIP M. HALPERN
United States District Judge

16